IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 20, 2019 Session

## STATE OF TENNESSEE v. SHAUN MICHAEL VINCENT

**Appeal from the Criminal Court for Putnam County**
**No. 2016-CR-30     Don R. Ash, Senior Judge**

_____

**No. M2018-01654-CCA-R3-CD**

_____

A jury convicted the Defendant, Shaun Michael Vincent, of aggravated robbery after he brandished a baseball bat and took property from the victim, who was attempting to pay the Defendant's girlfriend for sexual contact. The Defendant was sentenced to serve eleven years in confinement. On appeal, he challenges the sufficiency of the evidence and asserts that the trial court erred in limiting cross-examination of the victim, excluding evidence implicating the victim in prior sexual misconduct, and excluding a video of the victim's interactions with police. The Defendant further argues that the court erred in denying him jury instructions regarding defense of a third person and special instructions on aggravated robbery and that he is entitled to relief pursuant to cumulative error. After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Douglas K. Dennis, Cookeville, Tennessee, for the appellant, Shaun Michael Vincent.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Beth E. Willis and Victor Gernt, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTUAL AND PROCEDURAL HISTORY

The victim in this case, Mr. Jaramiah Hruska, was an attorney who had been implicated in prior sexual misconduct and arrested for patronizing prostitution. The State attempted to demonstrate that on October 8, 2015, the Defendant and his co-defendant, Ms. Britny Thompson, who were romantically involved, had schemed to place the victim in a sexually compromising position and then to rob and extort him in the hopes that his fear of professional reprisal would prevent him from reporting the crimes.[1] The defense attempted to show that the Defendant was aware of the victim's past misconduct, that by wielding the bat, he was merely protecting the co-defendant from being coerced into sexual activity, and that he lacked the intent to deprive the victim of his property, which the victim offered up in an attempt to escape a jealous boyfriend. In an unforeseen clarification of the events, the interaction between the three was video recorded by the co-defendant, although much of the video is focused on empty space and provides only audio of the incident.

The trial court held a pretrial hearing on the State's motion to exclude evidence of the Board of Professional Responsibility's ("BPR") investigation into the victim and to exclude the testimony of the victim's former neighbor and the victim's former client regarding the victim's past sexual misconduct. Detective Bobby Anderson of the Cookeville Police Department testified that in July 2015, he investigated allegations that the victim's neighbor met the victim at his office, where he paid her for sex. The victim initially denied having paid for sex. He ultimately acknowledged that there was an understanding that his neighbor would have sex with him in exchange for money for her car payments. He denied that he represented her as an attorney, but the neighbor told the detective that the victim had given her legal advice.

The trial court made an oral and subsequent written ruling regarding the evidence it would allow of the victim's past misconduct. The trial court stated that it would permit the Defendant to inquire into any leniency the victim may have received in his pending matters or otherwise, including any agreement with the BPR and including the fact that he was not charged with either patronizing prostitution or making a false police report in relation to the robbery. The court also found that the Defendant could impeach the victim with any prior statements the victim had made involving the robbery. However, the court excluded evidence regarding the victim's "prior prostitution activity" and the documents produced in the BPR investigation. The court found that under Tennessee Rule of Evidence 403, the probative value was outweighed by unfair prejudice, confusion of the issues, and misleading the jury. The court asked the prosecutor if she objected to the

---

[1] The trial court granted a motion to sever the defendants in part due to incriminating text messages sent by the co-defendant to someone identified in her telephone only as "Nate," in which she urged him to hurry because "dude to blackmail will be here soon."

Defendant's testifying that he attacked the victim knowing that the victim had sexually exploited other women, and the prosecutor said, "We have no problem with that."

Prior to the introduction of any proof at trial, the trial court permitted the defense to make an offer of proof regarding the testimony of two witnesses who stated they had been exploited by the victim. The victim's former client testified that the victim was appointed to be her attorney in 2012 or 2013. Despite the fact that he was her attorney and knew she was homosexual, the victim made sexual comments to her, and the victim's former client told him she was in a long-term relationship. The victim's former client later asked the victim if he could help her with money for her child as she reported to jail, and he offered to and ultimately did pay her for sex. She acknowledged she was taking a medication related to opiate addiction at the time of her testimony. The victim's neighbor likewise testified that the victim paid her for sex after providing her legal assistance. She testified that the victim lived next to her in public housing and that he had offered her legal services if she should need them. He gave her free legal advice at one point regarding a custody issue. The victim then began to send her sexual text messages and to offer financial help at a time when she was struggling financially, and she performed a sex act for money at his law office. She testified that she felt the victim had taken advantage of her desperate circumstances and that she was still angry with him.

After the offer of proof, the trial proceeded with the testimony of the victim, who stated that he was a licensed attorney currently practicing law. The victim was appointed to represent the co-defendant in a criminal matter in 2011, and he subsequently represented the co-defendant's then-boyfriend, Mr. Jacob Snyder, in a limited hearing on a furlough issue. The victim stated that he charged the co-defendant $100 for his work on Mr. Snyder's case and that she never paid him but had suggested "that there were other ways to pay." He asserted that he declined her offer and denied that he forgave the debt in exchange for sex.

The victim claimed that he was aware the co-defendant had worked as a prostitute in the past and that, some months prior to the robbery, she had proposed exchanging sex for money. According to the victim, he later contacted her, and they exchanged messages through text and Facebook for approximately a week before the robbery. The victim acknowledged that, on the day of the robbery, he went to the co-defendant's home planning to have sex with her in exchange for $150. He had previously told the co-defendant through messages that they should make a video because he believed it would be a legal way to pay for sex.

The video of the robbery was played for the jury, and the jury was given a transcript to assist them. The video showed the co-defendant setting up the camera immediately prior to the arrival of the victim. The camera was pointed at a wall, and the

co-defendant and victim were not visible for much of the recording. The co-defendant asked the victim for the money, and he responded that it was for the video. The co-defendant procured a condom for the victim and began to discuss her methamphetamine charges. She asked the victim how much he would charge to represent her, and he stated it would be "a couple of thousand" dollars, depending on the facts, but noted that they "couldn't do this anymore." They discussed the facts of her cases, and the victim instructed the co-defendant to bring him the discovery once she received it and said they could discuss the matter. The co-defendant then offered the victim oral sex and told him she was "about to be doing a lot better."

At that point, the Defendant entered with a baseball bat, asked the victim if he was preparing to have sex with the co-defendant, and ordered the victim, "Drop your sh*t. Drop it all, money[,] watch, everything." The co-defendant picked up the camera, allowing the viewer to see the Defendant attacking the victim. The victim repeatedly shouted, "Ow!" The co-defendant then placed the camera so that it was aiming mostly at the ceiling, and little was visible after that point. The Defendant asked the co-defendant for a knife, and the victim protested, offering the Defendant his watch. The Defendant told him to set the watch down. The victim stated he would put on his pants and leave, but the Defendant told him to get his wallet out and warned him, "You see the camera?.... It's all recording…." The victim asserted he had no money and urged the Defendant to look in his wallet.

During the interaction, the Defendant made several statements related to the victim's property. The victim asked for the return of his identification cards, and the Defendant told him that he would not get anything and should leave. The victim stated that he could not leave without his possessions or his car, and the Defendant told him to "[b]ack the f*ck back." The Defendant accused the victim of being a sexual deviant and told him, "Touch that wallet and credit cards and I'll beat your motherf***ing brains out." The Defendant observed that the victim had credit cards and that the Defendant was "fixing to burn them up." The co-defendant asked about the victim's telephone, prompting the Defendant to assert, "Okay, that's mine now."

The Defendant and co-defendant attempted to elicit incriminating statements from the victim on tape. The Defendant accused the victim of having told the co-defendant that he would represent her in exchange for sex, which the victim denied. The Defendant then questioned the victim regarding Mr. Snyder's case, and after some prodding, during which the victim said, "Ow," the victim stated that he and the co-defendant had had sex in relation to Mr. Snyder's case. The Defendant twice described the victim as "soliciting prostitution," once after the co-defendant asked the victim, "What [were] you giving me one-fifty for?" The Defendant accused the victim of being a rapist and stated, "You were raping my girlfriend when I c[a]me in here." The victim denied it. The co-defendant told

the Defendant that the victim had wanted sex. The Defendant asked the co-defendant if she was being raped, and she responded, "I didn't want it." The Defendant then described the situation as "two on one" and advised the victim to "pay up" in exchange for "all the files," assuring him, "It will be a one-time deal and it will be over with." The Defendant noted he had the victim's "Facebook pictures" and referenced a picture of the victim's penis which the victim had sent to the co-defendant.

The Defendant asked the victim what the victim wanted to do to avoid having his wife or the BPR find out about his plan to patronize prostitution, and the victim responded that he was filing bankruptcy and had nothing to offer. The Defendant demanded that the victim take out a personal loan for $5,000, and the victim stated he would try to get money but would have to explain things to his wife. The Defendant advised him to concoct a story and threatened to accuse him of rape if he went to the authorities, noting, "And I understand you're already under investigation for this sh*t once." The victim asked for his keys and assured the Defendant that he would tell police an unidentified man mugged him, noting that the Defendant had "all this … evidence" against him. The Defendant reiterated that he and the co-defendant would accuse the victim of rape and that his prior misconduct would weigh against him.

The victim testified about the recorded events. He asserted that he did not know that he was being recorded. According to the victim, he and the co-defendant had not engaged in any sexual activity when the Defendant appeared, wielding a bat and demanding that he "drop everything" including his keys, wallet, and telephone. Prior to the Defendant's appearance, the co-defendant had left the room twice, but the victim did not hear any indication that someone else was in the house. However, according to the victim, the front door had made a loud noise when he entered, and he also did not hear the door open while he was there. The victim stated that he was able to wrestle the bat away from the Defendant during the attack, but the Defendant threatened to use a knife and the victim returned the bat. The victim never saw a knife. The Defendant hit the victim with the bat and with his fists in the knees, legs, arms, hip, and head. The victim's injuries were not serious and consisted of a knot appearing later on his knee and head.

The Defendant demanded the victim's possessions, including his keys, wallet, and watch. The victim said the Defendant "may have made fun of" him for his Rugged Warehouse credit card. The victim stated that when he gave his possessions to the Defendant, the Defendant was standing between him and the door and had recently hit him with the bat. The victim stated that the Defendant would not "yield" and that his choice was either to try to fight his way out of the room or to negotiate with his property. As he walked out, the Defendant told him that if he tried to touch his wallet, the Defendant would "bash [his] … head in." The victim was afraid.

- 5 -

The victim testified that he had not had sex with the co-defendant as payment for legal services for Mr. Snyder but that he confessed to doing so because the Defendant had hit him with the bat when he denied it. The Defendant threatened to accuse the victim of rape and report him to the BPR if he attempted to go to the authorities, and the victim ultimately agreed to give the Defendant several thousand dollars at a later date.

The victim was able to keep his car keys and drove away. He immediately intercepted a police officer and reported the robbery. He acknowledged that he did not tell police that he was at the co-defendant's residence for the purpose of patronizing prostitution but instead told them that he went there to make a video. He admitted he was not honest, was "disingenuous," and that the agreement to make a video was merely as a ruse to avoid a prostitution charge. He agreed that he repeatedly told police that the Defendant had tried to get him to say things that were not true, and he explained that he meant stating he had sex with the co-defendant in exchange for representing Mr. Snyder and raping the co-defendant.

The victim agreed that he took the bat from the Defendant but stated that he was still at a disadvantage because he was naked, trapped, and afraid of being stabbed. He acknowledged telling a police officer that he could have killed or beaten the Defendant but declined to do so. The victim agreed that he told police that the offenders took his cash and wallet, but he acknowledged that he gave the co-defendant $150 voluntarily and that he may have had his wallet and $20 in a video recorded by police equipment.

The victim agreed that the Defendant came in accusing him of raping the co-defendant and that the co-defendant told him she "didn't want it." He agreed that he told the BPR that the co-defendant was trying "to fuel [the Defendant] on" by confirming the Defendant's belief she was being attacked.

The victim acknowledged that he had previously been charged with prostitution when he gave his neighbor money "and we had sex as well." On cross-examination, he agreed he could be disbarred for exchanging sex for legal services. He agreed he gave his neighbor free legal advice and then had sex with her in exchange for money. He knew that she was in financial difficulties and was physically disabled. He acknowledged that during that investigation, he initially denied wrongdoing and that he did not immediately report his arrest for patronizing prostitution to the BPR but only reported it after a newspaper article detailed the events over three weeks later. He acknowledged that he was not "forthcoming" with the BPR, that he was not sure he admitted he had patronized prostitution, and that he probably told the BPR he was receiving diversion. He testified that the Defendant was aware of the incident and felt the Defendant was relying on it "to be able to get away with this."

The victim stated that he had reported his conviction to the BPR and was currently attending counseling, working with a monitor in his professional life, and taking medication for his mental health issues. He agreed that he did not initially disclose to the BPR that the offense at issue involved prostitution and that he put the "best possible spin" on his actions. The victim explained, "I gave the best possible version of events the way it could be interpreted. Lie? No. Being disingenuous or dishonest? Yes." He agreed that he told the BPR that he did not give the co-defendant legal advice but acknowledged that he said in the video that she should "bring it to trial." He denied he ever intended to exchange legal services for sex.

The victim agreed that he could have been charged with patronizing prostitution for this incident but stated he had not received any guaranties of favorable treatment. He acknowledged, however, that he could no longer be charged due to the statute of limitations. He agreed that he was working with the prosecutor in the case at bar but that his charges involving patronizing prostitution were still pending at the time of the robbery. He did not believe that the prosecutor reported him to the BPR as required for attempting to patronize prostitution in this case. He denied that the outcome of the BPR investigation was conditioned on his testimony in this case.

Confronted with his Facebook messages, the victim acknowledged that his testimony that he only began messaging the co-defendant a week before the October 8th robbery was incorrect and that he had been sending messages, including pictures of his naked torso and penis, to the co-defendant since August. He asserted that she requested the pictures, but ultimately he acknowledged that he was the one who initiated a conversation about pictures.

During cross-examination, the defense sought to introduce a police video depicting the victim immediately after the offense. The State objected on hearsay grounds. The Defendant argued that the videos were relevant to impeachment and to the victim's physical condition, present sense impression, and mental state. The trial court stated that the defense could question the victim about inconsistent statements but could not introduce the video as extrinsic evidence unless the victim denied the prior statements. The court noted that the video could possibly be admitted through the police officers.

The defense attempted to introduce the video during the testimony of Detective Jeff Johnson of the Cookeville Police Department. Detective Johnson testified that the victim flagged him down and reported that he had been robbed of his wallet, telephone, and watch and that he had been hit with a bat. Detective Johnson was not on duty and asked the victim to wait to tell the details of the incident to other officers. Detective Johnson agreed that a condom fell out of the victim's pants in the parking lot. The

- 7 -

defense asked to introduce the video for the purpose of showing the victim's physical condition and for impeachment. The defense also submitted that the video was admissible under the best evidence rule. The trial court noted that the victim had admitted making certain false statements to police and that the video could not be introduced as extrinsic evidence for impeachment. The trial court concluded that the defense could play the video to show the victim's physical condition but that the video should be played with no sound to exclude hearsay statements.

The defense chose instead to play a video recorded by the body camera of Sergeant Daniel Trivette. The video was played without sound and showed the victim holding his wallet. Sergeant Trivette took the victim's statement and was able to track the victim's telephone to a motel in Sparta. Sergeant Trivette agreed that the victim had his wallet and that the victim stated he was planning to buy cigarettes.

Detective Steve Page of the White County Sheriff's Department apprehended the Defendant in Sparta. The Defendant jumped over a small wall and ran from Detective Page, who ultimately found him lying on the floor of a horse trailer in possession of the victim's credit cards. Detective Brent Anderson of the Cookeville Police Department collected the co-defendant's camera, which had recorded the events, from the vehicle used by the Defendant and co-defendant, and he collected several telephones, including the victim's telephone, from the vehicle.

The Defendant gave testimony supporting his theory that he was merely defending the co-defendant and had not intended to rob the victim. He stated that he assisted the co-defendant with rides to and from court at the time she was involved with Mr. Snyder. One day in July, he picked her up after a meeting with the victim, and she was visibly upset.

The Defendant knew that the co-defendant was engaged in prostitution with a limited clientele in the past, but he stated that he and the co-defendant became romantically involved and that at the time of the assault, she had stopped engaging in prostitution and had become pregnant. The Defendant testified that on October 8, 2015, he was in the co-defendant's neighborhood. Because the co-defendant would occasionally become unavailable by telephone, the Defendant became suspicious that she was hiding something, either a drug habit or infidelity. The Defendant noticed that the co-defendant's car was parked in the driveway of a neighboring, unrented home, and he quietly entered her home without knocking. He could hear a man in the house, and he accordingly picked up a baseball bat which was present in the home.

The Defendant stated he could hear a conversation related to the co-defendant's criminal matters. He also heard the co-defendant giggle and say, "I'm about to be doing

a lot better." He burst into the room and observed the co-defendant's face near the unclothed victim. The co-defendant looked as though she were about to cry, and the Defendant concluded she was being coerced and raped. He agreed that during the video, he mentioned a prior investigation into the victim, noting he had read about it in the newspaper. The Defendant stated that when the co-defendant told him that the victim had just wanted sex, he became confused about whether the co-defendant was being forced to do something she did not want to, and he put down the bat at that point and calmed down. He agreed that the co-defendant was not being held down and that the victim was not on top of the co-defendant but stated he felt she was being forced to engage in sex.

The Defendant testified that he "tapped" the victim with the bat because the victim had a significant size advantage. The Defendant testified that he never attempted to hurt the victim and that he told the victim to "drop" everything not because he was attempting to take the victim's possessions but because he was afraid the victim was armed. The Defendant was jealous and wanted the victim to feel helpless, but he testified that he never intended to rob the victim. He asserted that the victim first raised the idea of exchanging property. He also said that he did not expect to really get money from the victim through extortion but was "just talking" and wanted to "pick on him a little more." He stated that he only wanted to take the victim's pride and argued that he would not have robbed the victim because he knew the victim could identify the co-defendant. The Defendant testified that the victim left some of his possessions on the floor and that the Defendant merely picked them up. He denied ever having touched the victim's telephone.

The Defendant acknowledged asking the co-defendant for a knife but stated there was never a knife. He agreed that he referred to the fact that the events were being recorded on video, but he stated he did not know if the camera was actually recording. He explained that he observed the co-defendant touch the camera and that the co-defendant had videotaped him with the camera in that same location. Asked how he could have observed her touch it when he was assaulting the victim with his back to the camera, the Defendant stated he saw that it had been moved when he turned around.

The Defendant agreed that he knew about the sexual video the victim had sent the co-defendant. He stated he knew that the victim was an attorney and knew about the newspaper articles written about the victim's misconduct.

The trial court added a jury instruction on aggravated assault as a lesser included offense but refused a special instruction on aggravated robbery and an instruction on defense of another. The jury convicted the Defendant of aggravated robbery, and the trial

court sentenced him to serve eleven years in confinement. The trial court denied the Defendant's motion for a new trial, and the Defendant appeals.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant asserts that the evidence is not sufficient to support a conviction for aggravated robbery because the State did not establish that he intended to rob the victim of his possessions or that the property was taken by violence or putting the victim in fear. We conclude that the evidence is sufficient.

This court must set aside a finding of guilt if the evidence is insufficient to support the finding by the trier of fact of guilt beyond a reasonable doubt. Tenn. R. App. P. 13(e). The question before the appellate court is whether, after considering the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Pope*, 427 S.W.3d 363, 368 (Tenn. 2013). This court will not reweigh or reevaluate the evidence, and it may not substitute its inferences drawn from circumstantial evidence for those drawn by the trier of fact. *State v. Smith*, 436 S.W.3d 751, 764 (Tenn. 2014). The jury's guilty verdict, approved by the trial judge, accredits the State's witnesses and resolves all conflicts in favor of the prosecution. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The trier of fact is entrusted with determinations concerning witness credibility, factual findings, and the weight and value of evidence. *Smith*, 436 S.W.3d at 764. In reviewing the sufficiency of the evidence, we afford the State the strongest legitimate view of the evidence and all reasonable inferences that can be drawn from the evidence. *State v. Hawkins*, 406 S.W.3d 121, 131 (Tenn. 2013). "A verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, and on appeal the defendant has the burden of illustrating why the evidence is insufficient to support the verdict rendered by the jury." *Reid*, 91 S.W.3d at 277. "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Aggravated robbery as charged here is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear," when the robbery is accomplished "with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon." T.C.A. § 39-13-401(a), -402(a)(1). A deadly weapon includes "[a]nything that in the manner of its use or intended use is capable of causing death or serious bodily injury." T.C.A. § 39-11-106(a)(6)(B). Theft is committed when the offender "knowingly obtains or exercises

- 10 -

control over the property without the owner's effective consent" and "with intent to deprive the owner of property." T.C.A. § 39-14-103(a).

The evidence, seen in the light most favorable to the State, established that the Defendant walked in when the victim and co-defendant were preparing to engage in sexual activity. The Defendant began to attack the victim with the baseball bat and ordered him to "drop" his property, listing particularly his money and watch. The victim testified that he was afraid of the Defendant, that the Defendant would not let him leave, and that he gave up his property due to his fear. Although the victim briefly obtained possession of the bat, the Defendant made a threat about a knife that caused the victim to return the bat and offer up his watch for fear of escalating the situation. The victim expressed reluctance to leave without his possessions or car, and the Defendant told him, "Back the f*ck back." The Defendant also said, "Touch that wallet and credit cards and I'll beat your motherf***ing brains out," and he asserted the victim's telephone was his and that he intended to "burn . . . up" the victim's credit cards. The Defendant was apprehended hiding in a horse trailer with the victim's credit cards in his front pocket, and the victim's telephone was recovered from the car in which the Defendant had traveled.

The Defendant asserts that the victim's property was voluntarily given up by the victim or left behind by the victim without the Defendant's knowledge. He contends that the force was not contemporaneous with the taking. However, the video-taped incident establishes that the Defendant made multiple statements indicating his intention to take the victim's property, including describing the victim's telephone as "mine now," stating he would "burn . . . up" the credit cards, and warning the victim that he would "beat [his] . . . brains out," if the victim retrieved his wallet and credit cards. These statements are sufficient to support a finding that the Defendant intended to take the victim's property and that he did so by violence or fear. The Defendant also asserts that the State failed to prove that the Defendant acted knowingly or intentionally, instead offering up the defense theory that the Defendant only brandished the bat in an attempt to protect the co-defendant. However, a rational juror could have inferred from the sum of the Defendant's statements, including his negotiations of money for "all the files," and his description of the interaction as "[s]oliciting prostitution," that Defendant acted knowingly in taking the victim's property by means of the bat. The Defendant does not contend that the baseball bat was not a deadly weapon as it was used. *See State v. Howard P. Fisher*, No. M2017-00975-CCA-R3-CD, 2018 WL 3060369, at *3 (Tenn. Crim. App. June 20, 2018), *perm. app. granted* (Tenn. Sept. 13, 2018) (a baseball bat brandished from twenty feet away was a deadly weapon). A rational juror could have inferred that the co-defendant and Defendant plotted to film the victim in a compromising position and to take his property, relying on the victim's desire to avoid professional consequences to ensure his silence. The videotape and the victim's testimony established

that the Defendant intentionally or knowingly took the victim's property by fear or violence while brandishing the bat. We conclude that the evidence is sufficient to support the verdict.

## II. Cross-Examination

The Defendant asserts that the trial court erred in prohibiting him from cross-examining the victim about the investigation conducted by the BPR, in particular objecting to the exclusion of questions regarding the victim's own statements and of evidence regarding complaints made by the victim's female clients. The Defendant also asserts that he was prevented from questioning the victim regarding the prosecution's allegedly lenient treatment. He argues that the victim's profession unfairly bolstered his credibility and that his cross-examination would have shown that the victim was unreliable and that the investigations provided a motivation for the victim to lie. The trial court denied the motion for a new trial on this ground, finding that "leeway was given by the Court in regard to the questioning of the victim" and that "counsel for Defendant asked numerous questions regarding the Board and the victim." We conclude that the trial court did not abuse its discretion in placing limitations on cross-examination or in excluding evidence under Tennessee Rule of Evidence 403.

Cross-examination is a fundament right under the Confrontation Clause of the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. Brown*, 29 S.W.3d 427, 430-31 (Tenn. 2000). Under the Tennessee Rules of Evidence, a witness may be cross-examined on "any matter relevant to any issue in the case, including credibility." Tenn. R. Evid. 611(b). Cross-examination is permissible to show that a witness harbors bias. *State v. Gilley*, 297 S.W.3d 739, 765 (Tenn. Crim. App. 2008) (citing Tenn. R. Evid. 616). However, "[w]hile the right of cross-examination is fundamental, its exercise is controlled by the discretionary authority of the trial judge." *State v. Zirkle*, 910 S.W.2d 874, 890 (Tenn. Crim. App. 1995). Generally, "'the propriety, scope, manner and control of the examination of witnesses'" lies within the court's discretion. *State v. James*, 315 S.W.3d 440, 460 (Tenn. 2010) (quoting *State v. Caughron*, 855 S.W.2d 526, 540 (Tenn. 1993)). Accordingly, "'a defendant's right to confrontation does not preclude a trial court from imposing limits upon cross-examination which take into account such factors as harassment, prejudice, issue confrontation, witness safety, or merely repetitive or marginally relevant interrogation.'" *State v. Wyrick*, 62 S.W.3d 751, 770 (Tenn. Crim. App. 2001) (quoting *State v. Reid*, 882 S.W.2d 423, 430 (Tenn. Crim. App. 1994)). An unreasonable restriction of the right to cross-examine witnesses constitutes an abuse of discretion. *State v. Echols*, 382 S.W.3d 266, 285 (Tenn. 2012); *see State v. Gentry*, 538 S.W.3d 413, 429 (Tenn. 2017). Because the right is constitutional, "[w]hen a defendant is denied the right to conduct an effective cross-examination, the conviction will stand

only if the violation is deemed harmless beyond a reasonable doubt." *Echols*, 382 S.W.3d at 285.

"Initially, proof suggesting that a witness received or had reason to expect leniency from the State typically constitutes relevant evidence of bias." *Id.* In particular, bias may exist "when 'a witness has a pending criminal charge in the same jurisdiction in which he or she is testifying at trial' due to the possibility that the prosecutor's office would 'take favorable testimony into account when subsequently prosecuting the witness's pending charge.'" *State v. Jerome Sanders*, No. W2014-01513-CCA-R3-CD, 2015 WL 9433473, at \*23 (Tenn. Crim. App. Dec. 23, 2015) (quoting *State v. Eric James Taylor*, No. E2002-00966-CCA-R3-CD, 2003 WL 21542464, at \*5 (Tenn. Crim. App. July 9, 2003)).

Here, the trial court permitted the Defendant to cross-examine the victim regarding any leniency or favorable treatment he received from the prosecution, including his sentence to diversion for patronizing prostitution, the State's failure to charge him with any offenses committed in the incident under trial, and the prosecutor's failure to report his misconduct. The court also ruled that any prior statements made by the victim concerning the robbery, including those made in the course of the BPR investigation, would be admissible. The Defendant thoroughly cross-examined the victim at trial regarding the charges brought against him, the inquiry conducted by the BPR, and the potential consequences he faced as a result of the investigations. The defense highlighted the prosecution's decision not to bring charges against the victim for patronizing prostitution or filing a false report and its decision not to inform the BPR of the fact that the victim was patronizing prostitution in connection with the robbery. The Defendant also asked the victim about statements he had made to the BPR regarding the robbery, and the victim admitted the statements were disingenuous and dishonest. The Defendant was able to effectively explore any possible bias stemming from these sources. *See Gentry*, 538 S.W.3d at 429 (concluding that the record demonstrated that the party was able to cross-examine the witness).

The trial court also, however, concluded that the probative value of allowing the defense to explore in detail the victim's prior sexual misdeeds was substantially outweighed by unfair prejudice, confusion of the issues, and potential misleading of the jury.[2] *See* Tenn. R. Evid. 403; *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003)

---

[2] We note that Tennessee Rule of Evidence 404(b), cited by the Defendant, applies only when the prior bad acts at issue are committed by the accused. *State v. Stevens*, 78 S.W.3d 817, 837 (Tenn. 2002).

- 13 -

(holding that decisions regarding the admissibility of evidence under Rule 403 are reviewed for an abuse of discretion).

Although the Defendant refers generally to a sealed exhibit that was before the trial court when the trial court made some of its evidentiary determinations, he cites to no particular piece of evidence from that exhibit as having been improperly excluded from cross-examination. Instead, he argues generally that he should have been permitted to delve deeper into the investigations of the victim's prior sexual misdeeds with clients. However, we conclude that the trial court's restrictions were not an unreasonable restriction of the right of cross-examination or an abuse of discretion in the exclusion of evidence. *Echols*, 382 S.W.3d at 285; *Powers*, 101 S.W.3d at 395.

While we do not minimize the reprehensible nature of the victim's alleged prior actions, the victim's unsavory acts with "other female clients[] and female relatives of his clients" had minimal bearing on issues relevant to trial. Any bias in the victim's testimony stemming from these past offenses was adequately unearthed through the cross-examination related to lenient treatment. The victim's own testimony operated as a cudgel against any shred of credibility he retained as he made unsupportable distinctions between "[l]ie[s]" and "[b]eing disingenuous or dishonest."

The actual fact of the victim's abuses could only have been relevant to the robbery to the extent that the Defendant was aware of them. The Defendant claimed to have been motivated by a desire to protect the co-defendant from a man he knew to be a predator. Cross-examining the victim regarding the truth of the allegations or introducing records from the BPR of which the Defendant could not have known was not relevant to the Defendant's mental state or to whether the Defendant committed aggravated robbery against the victim. Contrary to the Defendant's suggestion, the victim's motives were not particularly germane to the issues at trial. As revolting as the victim's past behavior may have been, its relevance in this case lay in the Defendant's awareness of it, not in the truth of any allegations made against the victim. Furthermore, the Defendant was able to present evidence of some of the misconduct, including that the victim had been charged with patronizing prostitution, that the charge involved acts with a neighbor to whom he had also given legal advice, that he was not forthcoming in the subsequent investigation into his offense, and that he could face serious consequences for further misdeeds, particularly if they involved exchanging sex for legal services. We conclude that the trial court did not abuse its discretion in limiting cross-examination on this subject.

### III. Extrinsic Evidence of the Victim's Sexual Misconduct

The Defendant also objects that the trial court excluded extrinsic evidence of the victim's improper relations with two former clients, asserting that the excluded evidence

denied him his constitutional right to present a defense. We conclude that the extrinsic evidence was not admissible under the Tennessee Rules of Evidence and that the Defendant, who was able to introduce evidence supporting his theory of the case, was not deprived of his right to present a defense.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee the accused the right to present a defense, which includes the right to present witnesses favorable to the defense. *Brown*, 29 S.W.3d at 432. A denial or "'significant diminution'" of this right endangers the integrity of the judicial process. *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973)). "Although this right is critical, at times it 'must yield to other legitimate interests in the criminal trial process,' including 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.'" *Wyrick*, 62 S.W.3d at 770 (quoting *Brown*, 29 S.W.3d at 432). "So long as the rules of procedure and evidence are not applied arbitrarily or disproportionately to defeat the purposes they are designed to serve, these rules do not violate a defendant's right to present a defense." *State v. Flood*, 219 S.W.3d 307, 316 (Tenn. 2007). Ordinarily, an evidentiary decision does not rise to the level of constitutional error. *Id.* In determining error,

> [t]he facts of each case must be considered carefully to determine whether the constitutional right to present a defense has been violated by the exclusion of evidence. Generally, the analysis should consider whether: (1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important.

*Brown*, 29 S.W.3d at 433-34.

The Defendant's theory of the case was that when he saw the victim with the co-defendant, he attacked the victim because he believed the co-defendant was being forced or coerced into having sex. We agree with the Defendant that the *Defendant's knowledge* of the victim's prior predatory behavior is relevant to this defense. However, the extrinsic evidence excluded at trial and challenged on appeal has little bearing on the Defendant's state of mind or whether the Defendant thought that the victim was attacking the co-defendant. The Defendant's awareness of the prior misconduct was relevant to his motive in brandishing the bat, but during the offer of proof, neither witness testified that they had confided their abuse to the Defendant or that the Defendant was aware of the victim's offenses against them. Accordingly, their testimony would not have been relevant to the Defendant's motives. Neither would the victim's own written statements made in the course of the BPR investigation of the sexual misconduct. Moreover, contrary to the Defendant's claim, the victim's motives in coming to the trailer had little

- 15 -

bearing on whether the Defendant's acts of subsequently brandishing a bat and demanding the victim's possessions constituted aggravated robbery. Accordingly, the evidence was not critical to the defense, and the interest supporting its exclusion on the basis of unfair prejudice, confusion of the issues, and potential misleading of the jury was substantially important. *See Flood*, 219 S.W.3d at 316-18 (holding there was no error in excluding evidence that was not critical to the defense); Tenn. R. Evid. 403.

The Defendant asserts that he should have been allowed to present extrinsic evidence of the victim's misdeeds under Tennessee Rule of Evidence 616. Rule 616 provides that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Rule 616 relates to extrinsic evidence of bias or prejudice, but the testimony of the two witnesses and the victim's statements to the BPR regarding the women's allegations instead showed sexual misconduct and had no bearing on bias. *See* Tenn. R. Evid. 616. Insofar as the Defendant argues that the victim's neighbor's testimony would have been extrinsic impeachment evidence regarding the victim's past denial of patronizing prostitution, the victim acknowledged his prior inconsistent statements. *See* Tenn. R. Evid. 613(b); 608(b).

Furthermore, the video established that the Defendant was aware that the victim was already under investigation, that he was accusing the victim of rape, and that the co-defendant told him she "didn't want it." The Defendant was also able to testify that the co-defendant looked as though she were about to cry and that he had read about the investigation into the victim's offenses in the newspaper. The victim himself agreed that the co-defendant appeared "to fuel [the Defendant] on" by confirming his allegation of rape. The Defendant also testified that he ordered the victim to "drop" his property because he was concerned about the possibility that the victim had a weapon. Accordingly, the Defendant was not deprived of his ability to present his defense when the trial court excluded the two witnesses and his statements made in the course of the BPR investigation regarding past misconduct.

## IV. Police Video

The Defendant contends that the trial court erroneously excluded a "dashcam"[3] video from evidence. He asserts that the video would have proven inculpatory because it would have shown that the victim retained his wallet, would have demonstrated that the victim lied to police about his purpose in going to the co-defendant's home, and would

---

[3] The record contains a video, taken from a police officer's body camera, in which the victim falsely stated he went to the co-defendant's home for the purpose of making a video. There is no "dashcam" video in the record.

have demonstrated that the victim continuously hounded the responding officers to inform them that the Defendant had forced him to make a false confession. The Defendant further states the video would have shown the victim's physical state. However, the Defendant has not demonstrated that the entire video was admissible under the Tennessee Rules of Evidence, and he was permitted to introduce portions of the video. We conclude that the trial court did not err in limiting the video proof.

At trial, the State objected to the introduction of the statements from the video for the purposes of impeachment, although it noted it had no objection to showing a brief portion of the video demonstrating that the victim had retained his wallet. The Defendant did not offer the court a rationale for admitting the statements on the video other than that the video would show the victim's physical state, impeach him with inconsistent statements and the presence of his wallet, and provide the "best evidence" of the events. The trial judge told the defense, "I want to help you," but observed that the evidence was not admissible to impeach the victim when the victim had admitted making the prior inconsistent statements. The trial court held that it would permit the defense to play the video without the sound in order to show the victim's physical state and wallet but that the Defendant had not articulated a rationale to admit the victim's hearsay statements. The Defendant proceeded to play a recording which showed the victim's physical appearance and possession of his wallet.

On appeal, the Defendant relies on *Kirkendoll v. State*, 281 S.W.2d 243, 252 (Tenn. 1955), in which the Tennessee Supreme Court permitted the defendant's own tape-recorded confession to be played during trial. That case is inapposite, because it concerned an admission by a party-opponent rather than extrinsic evidence of a prior inconsistent statement from a witness. *See* Tenn. R. Evid. 803(1.2) (an admission by a party-opponent is an exception to hearsay). "Extrinsic evidence of a prior inconsistent statement remains inadmissible when a witness unequivocally admits to having made the prior statement." *State v. Martin*, 964 S.W.2d 564, 567 (Tenn. 1998); *see State v. Foust*, 482 S.W.3d 20, 39 (Tenn. Crim. App. 2015); Tenn. R. Evid. 613(b). The victim freely admitted to having lied on numerous occasions, including in the interaction recorded by police video. He particularly acknowledged that he falsely told police he went to the co-defendant's home to make a video when in fact he went to patronize prostitution. His statement to police that the Defendant forced him into a false confession was consistent with his testimony at trial. Accordingly, extrinsic evidence of the statements was not admissible pursuant to Rule 613(b). The Defendant references the best evidence rule, which provides that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by Act of Congress or the Tennessee Legislature." Tenn. R. Evid. 1002. However, Rule 1002 concerns the method by which a statement is to be put before the jury, not the admissibility of the underlying statement, which is still subject to the rule

against hearsay and other rules of evidence. *See Iloube v. Cain*, 397 S.W.3d 597, 602 (Tenn. Ct. App. 2012) ("The best evidence rule is a rule of preference rather than exclusion."); *State v. Carroll*, 36 S.W.3d 854, 867 (Tenn. Crim. App. 1999) ("[T]he satisfaction of one rule of evidence does not necessarily preclude the exclusion of evidence pursuant to another rule."). The Defendant has not advanced another ground for admitting the statements at trial or on appeal, and he was permitted to introduce the video without sound to demonstrate the victim's physical appearance and the victim's possession of his wallet. The Defendant is not entitled to relief.

## V. Defense of Another Jury Instructions

The Defendant asserts that the trial court erred in denying him jury instructions which could have allowed the jury to conclude that his conduct was justified as the defense of another. The State responds that the proof did not fairly raise the issue of defense of another. Because there was no evidence that the Defendant's use of force was to protect against the victim's use or attempted use of force, we conclude that the trial court did not err in refusing to give the instruction.

A statutory justification for the defendant's conduct provides a complete defense. T.C.A. § 39-11-601 ("It is a defense to prosecution that the conduct of the person is justified under this part."). When admissible evidence is introduced supporting a defense, the State must negate the defense beyond a reasonable doubt. T.C.A. § 39-11-201(a)(3), -203(d); *State v. Bledsoe*, 226 S.W.3d 349, 355 (Tenn. 2007).

The Defendant here submits that he was threatening or using force against the victim to protect the co-defendant. Tennessee Code Annotated section 39-11-612 provides:

> A person is justified in threatening or using force against another to protect a third person, if:
>
> (1) Under the circumstances as the person reasonably believes them to be, the person would be justified under § 39-11-611 in threatening or using force to protect against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected; and
>
> (2) The person reasonably believes that the intervention is immediately necessary to protect the third person.

- 18 -

T.C.A. § 39-11-612. Section 611 outlines the requirements for the justification of self-defense, which permits the use or threatened use of either force or force intended or likely to cause to cause death or serious bodily injury in certain circumstances.

"The issue of the existence of a defense is not submitted to the jury unless it is fairly raised by the proof." T.C.A. § 39-11-203(c). The threshold question of whether a defense has been fairly raised by the evidence is a question for the judge to determine. *State v. Blackmon*, 78 S.W.3d 322, 331 (Tenn. Crim. App. 2001). "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013). Instead, a court must consider the evidence in the light most favorable to the defendant, drawing all reasonable inferences in favor of the defense. *Bledsoe*, 226 S.W.3d at 355; *State v. Shropshire,* 874 S.W.2d 634, 639 (Tenn. Crim. App. 1993). "This is because it would be improper for a court to withhold a defense from the jury's consideration because of judicial questioning of any witness credibility." *State v. Bult*, 989 S.W.2d 730, 733 (Tenn. Crim. App. 1998). If the proof fairly raises the defense, the trial court must instruct the jury to determine whether the defense has been negated. *Blackmon*, 78 S.W.3d at 331.

The evidence at trial, seen in the light most favorable to the Defendant, established that the Defendant was aware that the victim had behaved in a predatory manner toward his clients, including the co-defendant. The Defendant knew that the victim had sent messages and a picture of his penis to the co-defendant. The Defendant entered the co-defendant's home and heard a man's voice. The co-defendant and the man were discussing the co-defendant's pending criminal matters, and he heard the co-defendant giggle and state, "I'm about to be doing a lot better." The Defendant burst in and saw the co-defendant near the naked victim, looking as though she were about to cry and as though she "didn't want to be doing what she was doing." He then attacked the victim, who immediately responded, "I'll get the f*** out of here." The Defendant continued to hit the victim, while instructing him to drop his money, watch, and other possessions.

The statute establishing the justification of defense of another requires that the force used by the accused be for the purpose of protecting "against the use or attempted use of unlawful force reasonably believed to be threatening the third person sought to be protected." T.C.A. § 39-11-612(1). It likewise requires a reasonable belief "that the intervention is immediately necessary to protect the third person." T.C.A. § 39-11-612(2). Force is defined as "compulsion by the use of physical power or violence and shall be broadly construed to accomplish the purposes of this title." T.C.A. § 39-11-106(a)(12).

- 19 -

While the proof seen in the light most favorable to the Defendant certainly included evidence from which the jury could have drawn the inference that the Defendant believed that the co-defendant was being coerced into a sexual relationship, there was simply nothing in the record from which the jury could have concluded that the Defendant reasonably believed that his use of force was immediately necessary to protect the co-defendant from any use of force by the victim. The record is devoid of evidence to support an inference that the victim used physical power or violence or to support an inference that the Defendant reasonably believed that his intervention was necessary to protect the co-defendant from the victim's use of physical power or violence. Accordingly, the trial court did not err in refusing the instruction. *See Bult*, 989 S.W.2d at 733 (concluding that the defense of another was not fairly raised because there was no evidence of imminent danger when the defendant asserted that he was acting for his child's welfare and safety in kicking in a bedroom door to exercise visitation when she had been removed to the bedroom by her mother and grandmother and was crying and upset).

## VI.  Aggravated Robbery Instructions

The Defendant asserts that the trial court erred in not giving special instructions he had requested for the aggravated robbery charge. The State responds that the issue is waived and without merit. Because there is nothing in the record to indicate what the special instructions sought by the defense were, we conclude that the issue is waived.

Generally, the trial court has a duty to give a correct and complete charge of the applicable law. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The right to a correct and complete charge is constitutional, and each issue of fact raised by the evidence should be submitted to the jury with proper instructions. *State v. Dorantes,* 331 S.W.3d 370, 390 (Tenn. 2011). Special instructions are intended "'to supply an omission or correct a mistake made in the general charge, to present a material question not treated in the general charge, or to limit, extend, eliminate, or more accurately define a proposition already submitted to the jury.'" *Id.* (quoting *State v. Cozart,* 54 S.W.3d 242, 245 (Tenn. 2001)). It is error to refuse a special instruction only when the standard charge, read as a whole, does not fully and fairly provide the applicable law. *State v. Adams*, 405 S.W.3d 641, 661 (Tenn. 2013). Jury instructions must be reviewed in their entirety, with no phrase examined in isolation. *State v. Rimmer*, 250 S.W.3d 12, 31 (Tenn. 2008).

Tennessee Rule of Criminal Procedure 30 provides that "any party may file written requests that the court instruct the jury on the law as set forth in the requests." Tenn. R. Crim. P. 30(a)(1). "It is the burden of the Appellant to prepare a full and complete record for appellate review." *State v. Banks*, 271 S.W.3d 90, 169 (Tenn. 2008)

(appendix); *see* Tenn. R. App. P. 24(b) ("[T]he appellant shall have prepared a transcript of such part of the evidence or proceedings as is necessary to convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal."). Accordingly, the failure to prepare a proper record results in waiver. *State v. Thompson*, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

The Defendant asserts in his brief that he requested in writing for the court to instruct the jury that "a robbery accomplished with a deadly weapon is complete once the accused has completed his theft of all the property he intended to steal," in accordance with the recent decision in *State v. Henderson*, 531 S.W.3d 687, 698 (Tenn. 2017). The record of the pretrial hearings reflects that the Defendant asked for an instruction and referred to *Henderson*, but it does not reflect what specific instruction the Defendant sought. The jury was instructed that "[t]he alleged fear or violence used in the taking of the property must precede, accompany, or occur at the same time as the taking to constitute an element of aggravated robbery." We conclude that the failure to include the requested instruction in the record constitutes waiver of the issue on appeal, and accordingly, the Defendant is not entitled to relief.

## VII. Cumulative Error

The Defendant also asserts that he is entitled to relief based on the sum of cumulative error. The doctrine of cumulative error recognizes that "there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." *State v. Hester*, 324 S.W.3d 1, 76 (Tenn. 2010). The doctrine of cumulative error only applies when there has been more than one error committed during trial. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). Accordingly, the Defendant is not in this case entitled to relief.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE

- 21 -